## BAUMER v. FRANKLIN COUNTY DIS-
## TILLING CO.
### No. 14.

District Court, E. D. Kentucky, Frankfort. Feb. 5, 1942.

Strother Kiser, of Lexington, Ky., for plaintiff.

S. S. Yantis, of Lexington, Ky., and Leslie W. Morris and Marion Rider, both of Frankfort, Ky., for defendant.

SWINFORD, District Judge.

This is an action for an alleged breach of contract.

The defendant was a whiskey distilling corporation manufacturing among other brands of whiskey "K. Taylor" and "Belle of Franklin". These two brands were the same whiskey bearing different labels.

The State of Ohio, with reference to its liquor dispensing policy, is what is known as a "monopoly" state. By this is meant that it sells directly to retailers as a wholesaler and no brands of whiskey are permitted to be sold in the State except from the store of the State itself. It is important therefore for distillers to have their brands listed by the Liquor Control Board of Ohio in order to have it retailed in Ohio.

Certain brands are listed for a trial period and if the demand of retailers during that period does not reach and maintain a certain quota the brand is "de-listed" and the Liquor Control Board declines to further handle it.

After getting a brand listed it is, of course, necessary and important to the distiller selling the brand to have the demand maintain the required quota. This is done through advertising and the usual sales methods of business concerns and by salesmen who make personal calls and contacts on the retailers to assist in popularizing and "putting over" the brand with the consuming public. Through negotiations which resulted in the following written contract the plaintiff was employed to assist in getting the defendant's products listed and sold in a given territory in the State of Ohio. The contract is quoted in full.

"March 7, 1940

"Mr. Francis E. Baumer
"2591 Eastern Avenue
"Cincinnati, Ohio
"Dear Mr. Baumer:

"A. We hereby assign the Cincinnati area, known as District A of the State of Ohio, as your territory, and give you the exclusive sales rights in that district for a period of three (3) years, beginning on the 1st day of February, 1940, subject to the following terms and conditions:

"B. The above sales rights are on the following brands listed by us in the State of Ohio, during the above period, only:

"'K. Taylor'       Bottled-in-Bond
"'Belle of Franklin'    3-years 90-proof

"C. The schedule rates of commissions to be paid you on the whisky sold by us to the Cincinnati area, known as District A of the State of Ohio, based on our present selling prices, are as follows:

"One (1%) percent on all prices quoted f.o.b. distillery on all whisky shipped into all districts other than District A.

"Five (5%) percent on all prices quoted f.o.b. distillery on all whisky shipped into District A.

"D. Commissions on any additional brands which may be listed in the State of Ohio are to be upon the schedule rate of commissions to be agreed upon between us at the time when the prices on such additional brands are submitted for listing.

"E. The commissions shall be payable to you by us, not later than the tenth (10th) of each month, on all purchase orders, indicating that the whisky mentioned in the said purchase orders has been removed from the warehouses in Ohio for distribution to the State Stores and/or permittees and/or special licensees, received from the Ohio Liquor Control Board during the preceding month.

"F. The distillery may, in its discretion, accept for return or credit any merchandise delivered and distributed in the Cincinnati area, known as District A of the State of Ohio, and any commissions thereon either due you or which have been paid to you shall be deducted from your account or be paid back to us.

"G. No salary or expenses of any kind are to be paid to you by us other than the commissions above mentioned.

"H. We are to furnish you with such promotional and advertising material for distribution in the State of Ohio which, in our discretion, should be used by you; and we will pay for all newspaper or other like advertising which we place in the State of Ohio, either ourselves or through our advertising agency, it being specifically understood that you are not authorized to place or contract for us any advertising of any kind, nature or description; nor to purchase, contract for or order any other advertising or promotional material of any kind for our account.

"I. You agree to furnish sufficient manpower to foster the distribution and sale of our brands in the Cincinnati area, known as District A of the State of Ohio, and to give the time, attention and effort of yourself and your employees toward promoting such sales at your own expense.

"J. It is further understood that you shall not collect or attempt to collect any monies due or to become due us, nor to execute or deliver any receipt in our name or for our account; nor to do any things other than which are provided for herein, and that all sales policies in the Cincinnati area, known as District A of the State of Ohio, are to be under the complete control of the distillery and nothing must be taken before the Ohio Liquor Control Commission, in person or by letter, without the knowledge and approval of the distillery.

"K. This contract is subject to renewal at the end of the three (3) year period, provided that the above stipulations have been complied with and the volume of whisky sold warrants such action.

"Very truly yours,
"The K. Taylor Distilling Co.,
Incorporated
"By E. P. Vollertsen,
President

"I agree to and accept all the terms and conditions of the above
"(Signed)
"Francis E. Baumer
"Dated: 3/14/40".

Upon the execution of this contract on March 14, 1940, both the plaintiff and defendant proceeded at once to institute a vigorous sales promotion campaign to maintain the listing of the brands in Ohio by pushing the sale of "K. Taylor" and "Belle of Franklin" whiskeys. This campaign entailed time, effort and expense and was in a large measure successful, especially with the "K. Taylor" brand.

On July 11, 1940, or about that time, the defendant sold the "K. Taylor" brand to another distilling company. It was taken off the market and the defendant thereby rendered itself unable longer to furnish the brand to the trade in the district in Ohio allotted by the contract to the plaintiff.

The sale of this brand to a competitor (National Distillers Products Corporation, Incorporated), according to the record, was made necessary by a number of independent happenings which included the general inability of the small distillery to compete with the larger, more entrenched distilleries,

with greater resources. The defendant was meeting this kind of competition rather unsuccessfully.

To add to its troubles a perpetual injunction was granted against it in the case of National Distillers Products Corporation et al. v. K. Taylor Distilling Co., Inc., D. C., 31 F.Supp. 611, 616, "restraining the defendant, its agents and servants, from using the name 'Taylor' or any phrase of which the name 'Taylor' forms a part, in its corporate name or in any of its whiskey labels or advertising matter, unless accompanied by a statement plainly and specifically showing that the defendant is 'neither the successor to nor connected with the maker of "Old Taylor" whiskey' and that its product is 'not the product of E. H. Taylor, Jr., & Sons or its successors.'" The opinion of the Court in this case also gave the plaintiff the right to call for an accounting by the defendant.

It further appears that financial difficulties confronted the company at about this time, since it owed a large amount of taxes and was bound for other obligations. In view of these circumstances its officials deemed it advisable to sell the brand "K. Taylor" to the competitor National Distillers Products Corporation.

The defendant, however, had on hand and was ready, willing and able to furnish the other brand, "Belle of Franklin". From the proof it is established that "Belle of Franklin" and "K. Taylor" were identical whiskeys, but sold under different labels.

By the sale of the "K. Taylor" brand the defendant could no longer furnish it to the trade in the Ohio district covered by the contract. The plaintiff asserts that by this voluntary act of sale the defendant by its own acts rendered itself incapable of carrying out its contract and is liable to him for anticipated profits which he would have realized had the contract continued in force.

In my opinion, his cause should fail and his "petition" (complaint) be dismissed.

■ In the first place there is nothing in the contract which required the defendant to furnish any particular brand. It was still able to furnish "Belle of Franklin" and while not the same label was the same product. It must be realized that whiskey is popularized by a combination of circumstances of which probably the second in importance is its name. It is a recognized fact that a brand of whiskey bearing the name "Taylor" is identified in the mind of the public, especially in this locality, as a good brand and is most likely easier to sell than some less well known name such as "Belle of Franklin". However, this fact, if it is a fact, as contended by the plaintiff, was known at the time the contract was made and could have been contemplated by the terms of the contract. If the defendant is able to furnish the same whiskey under another name there is no breach of the contract unless it is expressly provided to the contrary. After all it was for the plaintiff to determine which brand he would push more vigorously.

■ I am further of the opinion that the contemplated profits are too highly speculative to sustain an action for damages. The very nature of the product is such that its future success cannot well be estimated. It is not a necessity and while some persons pretend to possess fine taste senses it must be recognized that taste for all or any whiskey must be cultivated. Its sale generally is constantly under attack from a moral standpoint and there is never any assurance that it will be continued over any extended period of time. The history of our country and the attitude of the whole people renders it impossible to say whether whiskey can be sold at all in any given territory for a period of three succeeding years. To state now how much whiskey will be sold in District A of Ohio in the next three years, by the very nature of the product, is utterly impossible. The regulatory measures of maximum taxes, local option laws and the continual fight on what is termed a moral evil by a large percentage of the population in any given territory in this country distinguishes whiskey from other commodities where a minimum of profits might be ascertained from proof. In my judgment whiskey, and especially a brand put on the market only recently under the character of proof here, would not be classed with other products and falls within a class whose future consumption is so highly speculative that it does not sustain an action for damages for anticipated profits.

I quote the following language from the case of E. H. Taylor, Jr., & Sons v. Julius Levin Co., 6 Cir., 274 F. 275, 283: "In the case of an ordinary commodity, lost profits may often be computed with a minimum of uncertainty; but here the exclusive representation in the Levin territory was at the base of the business which he had built up and which he would have carried on. * * * All these elements of

## 21

the situation, added to the unexampled uncertainty as to effect of the then anticipated prohibitory and tax legislation, raise to the maximum the speculative features of an assessment of lost profits. We are not aware of any well-considered case where lost profits have been recovered under such conditions, and we think they bring the case within the rule forbidding speculative damages. Allis v. McLean, 48 Mich. 428, 12 N.W. 640; Howard v. Stillwell [& Bierce Mfg.] Co., 139 U.S. 199, 206, 11 S.Ct. 500, 35 L.Ed. 147; Anvil [Mining] Co. v. Humble, 153 U.S. 540, 549, 14 S.Ct. 876, 38 L.Ed. 814; Eckington [& Soldiers' Home R.] Co. v. McDevitt, 191 U.S. 103, 112–114, 24 S.Ct. 36, 48 L.Ed. 112; Howard [Supply] Co. v. Wells, 6 Cir., 176 F. 512, 516, 100 C.C.A. 70; Hollweg v. Schaefer [Brokerage] Co., 6 Cir., 197 F. 689, 701, 117 C. C.A. 83; Chicago [Life Ins.] Co. v. Tiernan, 8 Cir., 263 F. 325, 339."

The third, and to me the most cogent, reason why the plaintiff's cause should fail, is that by its terms the contract makes no provision for its continuance in the event the company sells out or goes out of business. This is always an eventuality known to contracting parties. It can be anticipated and provided for by the terms of the contract and a stipulated sum be named by way of liquidated damages should such occur. Nothing of that kind is contained in the contract. The enterprise was looked upon as sort of a joint venture by both parties. Capital was invested by both parties. Should the plaintiff have died or abandoned his contract the company could have done nothing and would have lost on its investment. To sustain the plaintiff's contention would be to enjoin the defendant from selling its business even though necessary to save it from bankruptcy. It was confronted with a situation where its directors for the benefit of creditors and stockholders must make a sale of this label. Can it be said that the welfare of a concern is in the hands of its contractual salesmen? Such is certainly not the law. It would have been easy to have stipulated a sum to be paid the plaintiff as liquidated damages. Such was not done and the defendant would likely have refused to make such a provision. But, the plaintiff wanted the contract and very likely would have accepted its terms even though such a contingency might have been discussed. I can find nothing in the record to justify a conclusion that the defendant was under obligations not to dispose of its business or to do or refrain from doing any other thing for the good of the company. The contract merely gave exclusive territory to the plaintiff and agreed to pay a stipulated sum on a percentage basis of all whiskey sold in that territory. Certainly it could not be required to sell whiskey in that territory at a loss to itself or to the extent that it must abandon all other business opportunities.

The views I have taken are sustained by the authorities. In the case of Pellet et al. v. Manufacturers' & Merchants' Ins. Co. of Pittsburg, Pa., 7 Cir., 104 F. 502, 510, a contract of exclusive agency on all insurance policies within a given territory was in question. The company had been purchased by another insurance company and the agent sought damages for a breach of contract as in the instant case. In denying the recovery the court said: "A broker employed exclusively to sell upon commission real estate, grain or live stock, through a given period, may insist that, if within that period sales are made through another agency, his commissions shall be paid notwithstanding. His right, in that respect, is founded upon the implied promise that he shall receive commissions upon all sales made. But if the owner of the real estate, grain or live stock chooses, in the exercise of his judgment, to retain his property, and make no sales, the broker may not recover according to the measure of his mere expectancy; for there is no implied contract that the owner shall be deprived of the right to determine when he shall sell, or how much he shall sell, or whether he shall sell at all."

The rights, if any, here must be upon the wording of this express and written contract and for the Court to write into it something the parties declined to do is to substitute the given contract for one of the Court's own making. To read this contract as if it denied the defendant the right to sell its plant is in fact making another contract. William S. Gray & Co. v. Western Borax Co., Ltd., 9 Cir., 99 F.2d 239; Stockton Commission Co., Inc., v. Narragansett Cotton Mills, Inc., D.C., 11 F.2d 618.

The principle of law applicable to the facts of the case at bar is best stated in the following language from the opinion in the case of Friede v. White Co., D.C., 244 F. 272, 274: "The agreement is commercial, and presupposes that both sides will con-

tinue in good faith to prosecute the venture in which they have engaged. Nevertheless the principal does not place the conduct of his business in the hands of his agent or agree in advance that every order which the agent sends in must be accepted, regardless of his own judgment as to what business it will be profitable for him to transact. If it were so, the principal would have abdicated the conduct of his own affairs. If, on the other hand, the principal does not honestly exercise that judgment, but is moved by a desire to exclude the agent, or by any personal motive other than to prosecute his business with a sole eye to its success, he is responsible. This is what is meant by an 'arbitrary' refusal of orders. This fact the agent must allege and prove, since prima facie the principal is presumed to be acting in accordance with the arrangement which gives him complete freedom as his judgment may dictate."

The complaint should be dismissed.

Proper findings of fact, conclusions of law and judgment should be prepared and submitted in accordance with this opinion.